UNITED STATES *v.* INTERNATIONAL GRAPHITE & ELECTRODE CORP.
(No. 4051)[1]

United States Court of Customs and Patent Appeals, June 7, 1937

*Joseph R. Jackson,* Assistant Attorney General (*Daniel I. Auster,* special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Albert Mac C. Barnes* and *Joseph Schwartz* of counsel) for appellee.

[1] T. D. 49066.

[Oral argument April 7, 1937, by Mr. Auster and Mr. Schwartz]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, in reappraisements 97908–A to 97942–A, inclusive.

Merchandise, consisting of "electrodes and nipples of various sizes," was imported into the United States from Canada, and entered at the port of Niagara Falls, N. Y. That covered by reappraisements 97908–A and 97909–A was imported under the Tariff Act of 1922, and that covered by the other protests was imported under the Tariff Act of 1930. It was entered, according to the statements of counsel for appellee, "at the cost of production," $.088 per pound, and was appraised by the local appraiser at its alleged foreign value, $.20792 per pound.

The importer appealed to reappraisement.

On the trial before the trial court, November 16, 1931, Brown, Judge, presiding, evidence was submitted by the parties. Sometime subsequent to that date, counsel for the parties submitted briefs, and, on February 17, 1932, the trial court reopened the case and restored it to the Buffalo docket. In so doing the court stated, in substance, that it appeared from the record that the merchandise had neither foreign nor export values, and that, although it apparently had United States values, such values had not been established either for that imported under the Tariff Act of 1922, in accordance with the provisions of section 402 (d) of that act, or that imported under the Tariff Act of 1930, in accordance with the provisions of section 402 (e) of that act. The court further stated that—

In these circumstances justice and fairness requires that the case should be returned to the Buffalo docket for proof of United States value for all the items in dispute, including the amounts of the statutory deductions and such other admissible evidence as the parties may see fit to offer.

It is, therefore, ordered, on the court's own motion, that the case be reopened and restored to the Buffalo docket and be open for all purposes.

On June 9, 1932, the cause again came on for trial at Buffalo, N. Y., Tilson, Judge, presiding, at which time counsel for the Government objected to the introduction of any further evidence on the ground that the order of Judge Brown reopening the case was without authority of law, and contended that the cause should be decided upon the evidence originally submitted. The objection was overruled by the court, to which ruling counsel for the Government duly excepted. Additional evidence was introduced by the parties, and, at the request of counsel for the Government, the trial of the cause was continued.

On June 9, 1933, the cause again came on for trial, Evans, Judge, presiding. Counsel for the Government renewed its objection to the introduction of additional evidence for the reason hereinbefore stated. The objection was overruled, and exception taken to the ruling of the court. Additional evidence was submitted, and, on motion of counsel for the Government, the trial of the cause was again continued.

On July 10, 1934, the cause again came on for trial, Kincheloe, Judge, presiding. Counsel for the Government moved to dismiss the importer's appeal on the ground that the order by Judge Brown reopening the case was without authority of law. The motion was overruled by the court, to which ruling counsel for the Government duly excepted. Additional evidence was submitted, and, with the consent of counsel for the parties, the cause was transferred to Judge Brown for decision.

Thereafter, the trial court, Brown, Judge, presiding, held that the merchandise had neither foreign nor export values, and that its dutiable values were its United States values, which were set forth in the court's decision overruling the Government's motion for rehearing.

In its decision, the appellate division of the United States Customs Court, in an opinion by Sullivan, Judge, after discussing the inherent power of courts generally to grant *new trials* on the court's own motion, stated that, as a voluminous record had been made up subsequent to the reopening of the case by Judge Brown, it would be a greater error to dismiss the appeal than to decide the case on its merits. The court reviewed the facts in the case and held that the merchandise had neither foreign nor export values; that its dutiable values were its United States values; that the values found by the trial court were correct, and, accordingly, affirmed its judgment.

Counsel for the Government here contend that the testimony of the witness for the importer, and the evidence introduced by the Government, on the original trial before Judge Brown, fully establish that the involved merchandise had foreign values on the dates of its exportation to the United States, although, it is claimed, the importer failed to establish what those values were; that the importer's appeal to reappraisement should have been dismissed; that the trial judge had no power to reopen the case on his own motion for the taking of additional evidence; that, as the merchandise had foreign values, it was error for the appellate division of the Customs Court to hold that its United States values were its dutiable values; and that, assuming, without admitting, that the court was right in so holding, it erred in allowing "an item of freight in the amount of $.0041 per pound."

Counsel for appellee contend that the trial court had the inherent power to reopen the case for further evidence, and, in support of their

contention, cite 46 C. J. §§ 244 and 245, pp. 285 and 286, which relate to the power of a court to grant a *new trial* on its own motion. Counsel further contend that precedent for the course taken by Judge Brown, is found in the case of *C. J. Tower & Sons* v. *United States*, reappraisement 54607-A, Reap. Circ. 284, November 12, 1926, where Judge Waite, due to the fact that he was unable to find values from the records submitted, reopened the case for further evidence. (It may be said in this connection that a similar course was taken by McClelland, Presiding Judge, in the case of *Prudential Lumber Corp. et al.* v. *United States*, 67 Treas. Dec. 1356.)

It is further contended by counsel for appellee that the preponderance of the evidence supports the finding of the appellate division of the Customs Court that the involved merchandise had neither foreign nor export values; that its dutiable values were its United States values; that those values were correctly determined by that court; and that, therefore, the judgment should be affirmed.

That the United States Customs Court is a United States court, cannot be questioned. See *United States* v. *Kurtz, Stuböeck & Co.*, 5 Ct. Cust. Appls. 144, T. D. 34192, and cases cited; *United States* v. *Macy & Co., Inc.*, 13 Ct. Cust. Appls. 245, T. D. 41199.

Prior to the enactment of the Tariff Act of 1922, the Board of General Appraisers [now the United States Customs Court] did not act as a judicial tribunal in *reappraisement proceedings*. However, under the provisions of the Tariff Acts of 1922 and 1930, such proceedings before the trial judge, and, upon appeal, the appellate division of the United States Customs Court, are judicial in character. *United States* v. *McConnaughey & Co. (Inc.)*, 13 Ct. Cust. Appls. 112, T. D. 40944. It would seem to be clear, therefore, that, in reappraisement proceedings, the trial court is a court of the United States. We are confirmed in this view by the provisions of sections 501 and 518 of the Tariff Acts of 1922 and 1930.

It is within the inherent power of courts of the United States, in the absence of a statute to the contrary, to reopen a case for the purpose of permitting the introduction of additional evidence, or for any other purpose "consonant with justice and a correct decision" at any time before a final judgment has been entered. The exercise of that power lies within the sound discretion of the court, and is not subject to review, unless there has been an abuse of such discretion. Ordinarily, such power is exercised on motion by one of the parties. That a United States court has the power to reopen a case on its own motion for the purpose of permitting the introduction of additional evidence in the interest of justice, so long as formal notice is given the parties whose rights are to be affected so that they may be present and cross-examine the witnesses called, is not open to serious question. See 64

C. J. §§ 1011, 1012, 1013, 1014, and 1015, pp. 1204, 1205, and 1206; *G. Amsinck & Co.* v. *Springfield Grocer Co.*, 7 F. (2d) 855.

It is true that, under section 501 of the Tariff Act of 1930, it is the duty of the trial judge sitting in a reappraisement proceeding to determine the value of imported merchandise "after affording the parties an opportunity to be heard," and that section 518 of that act specifically authorizes the trial court, in such a proceeding, to grant a rehearing or retrial when, in its opinion, the ends of justice so require. The provisions of those sections, in our opinion, neither expressly nor impliedly prevent the trial court from conducting trials in reappraisement proceedings in a judicial manner, and the Congress must have intended to invest such court with large judicial discretion (possessed by other trial courts of the United States) over the conduct of the trial so that its decision, "which becomes the basis of all subsequent proceedings," as stated by this court in the case of *United States* v. *F. W. Woolworth Co. et al.*, 22 C. C. P. A. (Customs) 184, 191, T. D. 47126, may be judicial in character as well as in name. See 4 C. J. § 2781, p. 810, and cases cited in note 42.

We are of opinion, therefore, that the trial court had the power, within its judicial discretion, to reopen the instant case for the submission of additional evidence, and that the exercise of such power is not subject to review unless there has been an abuse of such discretion.

Obviously, the power to reopen a case after it has been submitted by the parties should be exercised only in those exceptional cases where the administration of justice would seem to require it, and where neither of the parties would be prejudiced by such action.

The trial court was of opinion in the instant case that justice and fairness required that the case be reopened for the purpose of the submission of such additional evidence as the parties might deem proper, and, on its own motion, it was so ordered. Both parties had formal notice of the court's action and were afforded the opportunity, which was fully exercised by them, to be present at the trial and to submit such evidence as they desired.

No claim is made here that the Government has been prejudiced in any way, or has suffered any injustice as a result of the reopening of the case. We are unable to hold, therefore, that the trial court's action amounted to an abuse of its discretion. See *Alaska United Gold Min. Co.* v. *Keating*, 116 Fed. 561, 565.

We deem it unnecessary to review the several decisions of this court cited by counsel for the parties, which, it is claimed, have some bearing on the issue hereinbefore discussed, as that issue was neither presented nor discussed in any of them.

Relative to the contention made by counsel for the Government that the involved merchandise had foreign values, the appellate division of the Customs Court stated in its opinion that—

As to the second ground urged by the Government that the appraisement should have been on the basis of the foreign value: We find from the facts that there was no foreign value or export value for this merchandise. *The peculiar situation under which it was manufactured, that is sustained not only by the importer's witnesses but by the special agent's report, Exhibit 3, convinces us that as to this merchandise there was no merchandise of the same or similar character sold in the foreign market.*

\*        \*        \*        \*        \*        \*        \*

The facts in this case are not in serious dispute. The testimony establishes that the merchandise involved was the *result of an experiment on the part of the plaintiff to establish a competitive article against foreign merchandise in the United States. This effort failed, as established by the testimony.* It appears from the oral testimony that certain electrodes were shipped by the plaintiff to a subsidiary company in which it had a fifty percent ownership in Canada for completion and finishing, and that the same were shipped to the United States and sold to customers in this country. *There was no sale for this merchandise in Canada, or at least only a very limited amount.* The sales in the United States, as shown by Exhibit B, ranged in price from $.1835 to $.1517 per pound. From these prices were deducted 8 per centum for profit and 8 per centum for expenses, $.0041 for freight, and a duty of 45 per centum, leaving a United States sales price ranging from $.1266 to $.1046. These were on a consignment basis.

*It is contended that there was a foreign market for this merchandise; if not for identical merchandise, that there was for similar merchandise.*

The oral testimony is uncontradicted that these experimental electrodes were unsatisfactory to the trade; that they had a high electrical resistance, and thereby were unsuitable for the uses for which they were manufactured. The witnesses for the plaintiff are unanimous with reference to this fact. *In nearly every instance the merchandise sold in the United States was returned; in many instances replaced; and in other instances, allowances were made therefor. In fact, the entire sales in the United States were only of limited quantities, and the merchandise was soon withdrawn from the market. This had reference to the merchandise involved, being grade 80.* In many instances, letters were sent by purchasers to the plaintiff, alleging that the merchandise could not be used, and either returning it, or asking replacement, and, in addition, asking the return of the freight.

\*        \*        \*        \*        \*        \*        \*

As a matter of fact, they proved so unsatisfactory that grade 80 was withdrawn from the market, and grade 85 substituted in its place, which apparently met conditions. One could not ascertain the difference between these two electrodes by ocular observance. A test is required. There were two tests, one in the laboratory, and one by use. The use test demonstrated them to be unusable.

*In Canada, electrodes of this character, apparently similar in appearance and weight, were sold by certain concerns. When grade 80 was used in Canada, if any, the same results were obtained. There was therefore no market in Canada for this merchandise, and these electrodes were not similar to the electrodes sold in Canada for the very obvious reason that electrodes, grade 80 of this plaintiff, could not be used by reason of defects in manufacture or in the formula used in manufacturing them. Therefore, this merchandise was not similar to the electrodes used in Canada. Not being similar, of course, there was no foreign market.* There could not be an export market, as the manufactured article in Canada was sold to the plaintiff itself, who controlled 50 per centum of the company manufacturing the merchandise therein,

and sold it itself in Niagara Falls, N. Y. The proof is abundant that there was neither an export nor a foreign market. It therefore follows that the United States value must govern. [Italics ours.]

It appears from the record that in the fall of 1929 the Speer Carbon Co. of St. Marys, Pa., began to manufacture carbon rods in accordance with a secret formula; that these rods were sold and shipped to The Exolon Co. of Thorold, Canada, where they were manufactured into graphite electrodes and nipples therefor; that the greater portion of the finished electrodes were sold and shipped to the International Graphite & Electrode Corporation of Niagara Falls, N. Y., which was owned and controlled by the Speer Carbon Co. and The Exolon Co. The International Graphite & Electrode Corporation, in turn, sold such electrodes to various purchasers in the United States.

It clearly appears from the record, and it is admitted by counsel for appellee, that merchandise exactly like that here involved was sold to various purchasers in Canada by The Exolon Co. on instructions from the International Graphite & Electrode Corporation.

The witness, William A. Harty, president of the International Graphite & Electrode Corporation and of Exolon Co., testified as follows with reference to sales made in Canada:

X Q. And at the time of the shipments of this merchandise to the United States they were not shipping any merchandise to any place in Canada or any other place in the United States?—A. At the time of these shipments The Exolon Company was shipping it, on the order of the International Graphite & Electrode Corporation, *to wherever they wanted it shipped.*

Judge BROWN. He asked you if they directed it be shipped.

The WITNESS. The shipments were made from the plant of The Exolon Company in Canada.

By Mr. McKENNA:

X Q. *Are you familiar with the prices at which that merchandise was offered in the Canadian market?*—A. *The prices would be similar to the prices applying in the United States.* In some cases the merchandise was given away, and in other cases it was paid for.

Judge BROWN. *Well, where it was paid for, what were the prices?*

The WITNESS. *The same prices as in the United States.*

By Mr. McKENNA:

X Q. *15 to 20 cents?*—A. *13, in Canada.*

X Q. *13 to 20 cents?*—A. *Yes.*

\*         \*         \*         \*         \*         \*         \*

X Q. *And what was the quantity in which you usually sold this merchandise in the Canadian market?*—A. At the time this was going on?

X Q. Yes.—A. *Small trial lots only.*

X Q. Small trial lots.

Judge BROWN. How large were they? They were not carload lots?

The WITNESS. *No, Your Honor; they might be five or six pieces.*

\*         \*         \*         \*         \*         \*         \*

R. D. Q. Did you state, in answer to Mr. McKenna's question, that The Exolon Company had made shipments to purchasers in Canada?—A. On the

instructions of the International Graphite & Electrode Corporation; The Exolon Company hasn't made them.

R. D. Q. *Shipments were made?*—A. *In the name of the International Graphite & Electrode Corporation.*

R. D. Q. And were those accepted by the purchaser?—A. Accepted by the purchaser?

R. D. Q. Yes.—A. *Accepted in the sense that it was received.*

R. D. Q. Well, was any of it returned?—A. *Some of it was replaced. I don't know the details of it.*

R. D. Q. On complaint of the purchaser?—A. On complaint of the purchaser.

R. D. Q. And you did replace that with grade 85?—A. In some cases we replaced it with a grade that had less density.

R. D. Q. Without charge?—A. Without charge, in every case. [Italics ours.]

In presenting the case to the trial court, Kincheloe, Judge, presiding, counsel for appellee stated that—

Now, there was only one manufacturer that made a commercial quality of electrode here so they had difficuly in getting into the market, but that difficulty was vastly accentuated by the fact that this production which they turned out in the form of blank electrodes and then complete electrodes in Canada and which was known in their trade as Grade 80 turned out to be a commercial monstrosity. It was returned by customers after they tried it. *They made trial lot sales in the United States, and they made them in Canada.* And complaints came back from customers, and in a great many instances they had to replace them with electrodes which they made later on of a different formula and which was satisfactory. In other cases they had to repay the amount that had been paid for them; *and in other cases the customer who had given the trial order, took them, tried them, paid for them, said nothing, but never came back for another order.* [Italics ours.]

In response to Judge Kincheloe's statement, "You said there is nothing like this, or similar to it, in the world. I asked you why you are claiming United States value," counsel replied:

Because it was sold in the United States and the people here rejected it. It is the only thing I can claim, strange to say. Your Honor, if you take the United States selling price, that shows the effect of this whole transaction. Just to demonstrate, *when you take the price at which these people sold in the United States those trial lots,* together with 8 percent for profit and 8 percent for overhead and a duty of 45 percent, and a small item of transportation of 38 miles in Canada, you get back to the figure of .090, instead of .088. [Italics ours.]

The witness G. J. Fehrenbach, assistant treasurer of the International Graphite & Electrode Corporation, testified that sales of merchandise of the kind and character of that here involved were made in Canada. We quote from his testimony:

X Q. Let us get back to the original merchandise, Grade 80. *You sold Grade 80 to some people in Canada?*—A. Yes.

X Q. *You had complaints from them?*—A. Yes.

    *     *     *     *     *     *     *

X Q. *You testified on direct examination you made sales to Canadian people.*—A. *Yes, sir.*

X Q. Please tell the court to whom you made any sales of this merchandise, Grade 80, in Canada.—A. I would have to refresh my memory from some records.

Judge KINCHELOE. Have you some records to refresh your memory from?

The WITNESS. Yes, sir.

Mr. AUSTER. I just asked him if he had any records here.

Judge KINCHELOE. Proceed.

The WITNESS. You want a list of the names of our customers in Canada?

By Mr. AUSTER:

X Q. Did you make any sale to the Welland Steel Castings Company, Limited?—A. Yes.

X Q. How much did you sell to that concern?—A. ·103 pounds.

X Q. And the date?—A. March 28th.

X Q. And did they make a complaint?—A. Yes.

X Q. What did you do regarding their complaint?—A. We did nothing about their complaint.

X Q. Who else did you sell to?—A. Canadian Industries, Limited.

X Q. How much?—A. 460 pounds.

X Q. When?—A. On April 9th.

X Q. What is the price?—A. $69.08.

Judge KINCHELOE. What was the price on the first one you gave?

The WITNESS. $21.43.

By Mr. AUSTER:

X Q. That is the total price you are quoting?—A. Yes.

X Q. What was the price per pound?—A. In the first instance it is $0.208.

X Q. And in the second instance?—A. $0.15.

X Q. Did the Canadian Industries, Limited, make any complaint?—A. Yes.

X Q. What did you do about their complaint?—A. We replaced them. We made an adjustment.

X Q. Who else did you sell to?—A. Canadian Westinghouse Company, Limited.

X Q. How much and when?—A. 493 pounds; May 24th.

X Q. How much per pound?—A. $0.208.

X Q. Any complaint from that company?—A. No complaint from that company.

X Q. Anybody else?—A. The Canadian Westinghouse Company, Limited, again on August 4th.

X Q. 1930?—A. Yes.

X Q. How much?—A. 516 pounds.

X Q. When?—A. August 4th.

X Q. How much per pound?—A. $0.208.

X Q. Anybody else?—A. American Cyanamid Company; 42 pounds; unit cost $17.35.

X Q. You mean unit sales price?—A. Unit sales price; yes.

X Q. Any complaint from that company?—A. No complaint.

X Q. Anybody else?—A. The American Cyanamid Company on the same day, 193 pounds, unit price $0.17.

X Q. Any complaint?—A. No complaint.

X Q. Anybody else?—A. The American Cyanamid Company again on the same day, 173 pounds at $0.1690.

X Q. Any complaint?—A. No, sir.

X Q. Anybody else?—A. Joilette Steel Company, Limited.

X Q. How much and when?—A. 1,800 pounds.

X Q. At what price?—A. $0.1678.

X Q. Any complaint?—A. No complaint.

X Q. Anybody else?—A. The American Cyanamid Company; 71 pounds at $0.1735.

X Q. Give us the date.—A. October 1st.

X Q. Any complaint?—A. No complaint.

X Q. Anybody else?—A. The Canadian Brake and Shoe Foundry; November 29th, 106 pounds at $0.1620. Shipment was·unsatisfactory and later replaced.

X Q. Anybody else?—A. The Dominion Foundry and Steel Company.

X Q. The amount and the date.—A. December 8th; 1,700 pounds at $0.1627; no complaint. The Canadian Brake Shoe and Foundry Company; November 29th, 929 pounds at $0.1475. Shipment was replaced.

X Q. What was the date of that shipment?—A. November 29th.

X Q. And the shipment was replaced with additional merchandise?—A. Yes, sir.

X Q. With what kind of merchandise?—A. Merchandise of a different kind.

X Q. What did they purchase?—A. They purchased our Grade 80.

X Q. What was the reason for the replacement?—A. The material was unsuitable.

X Q. Did they make a complaint?—A. Yes.

X Q. Is there anybody else you shipped Grade 80 to?—A. I think I have given you all of them. [Italics ours.]

When asked on cross-examination the average figure at which the merchandise sold in the Canadian market, the witness said: "$0.1732."

The witness A. S. Bemis, general.superintendent of the Speer Carbon Co. and the International Graphite & Electrode Corporation, testifying for the importer, on cross-examination testified as follows with reference to Canadian sales:

X Q. You are familiar, I assume, with the merchandise that was shipped to the Canadian people of Grade 80?—A. Yes.

X Q. You are also familiar with the merchandise shipped to the American buyers of the same grade, Grade 80?—A. Yes.

X Q. That was merchandise that was produced at the Exolon Company at Thorold, Ontario, was it?—A. Yes.

X Q. Would you say that both were the same, the merchandise shipped to the Canadian buyers and that shipped to the American buyers?—A. The same material.

X Q. Grade 80 that was shipped to the American buyers was the same thing as the Grade 80 shipped to the Canadian buyers?—A. Yes, sir.

X Q. The Grade 80 purchased in the United States and the Grade 80 purchased in Canada was the same product?—A. Yes, sir.

X Q. There is no distinction between them?—A. No, sir.

During the cross-examination of the importer's witness Fred E. O'Neil, salesman and sales engineer of the Acheson Graphite Co. which company is engaged in the manufacture of commercially satisfactory graphite electrodes, counsel for the importer made the following statement:

I object to any segregation of sizes *because sales in Canada which were made by us have been made in sizes from 10 by 60 down to 2 by 36, the whole range.* · [Italics ours.]

With reference to the graphite electrodes sold by appellee, the witness William A. Harty stated that "A wholesale quantity, as we regard

it, is a carload, a minimum of 36,000 pounds"; that the total quantity involved in "these reappraisements" is about 40,000 pounds, only 4,000 pounds more than the "usual wholesale quantity"; that, so far as he knew the only sale ever made in a quantity as high as 36,000 pounds, was made to the Ford Motor Car Co., Detroit, Mich., and that to "a concern that is willing to give a blanket order to get a lower price than will apply on a ton lot, contract prices apply. That was something we didn't know until we had this price list made." The witness later stated that the price list was received in December 1930, at least two months after the last importation involved in this appeal.

We quote further from the testimony of the witness:

—A. The wholesale price would apply whether he bought it in a wholesale quantity or didn't; he would get a wholesale price if he bought a ton; he would get a lower price than if he simply sent in an order for a ton of electrodes.

*　　*　　*　　*　　*　　*　　*

—A. The prevailing practice in the sale of electrodes is to arrange the prices so that—practically from 2,000 pounds to 500,000 pounds, and the price is arranged accordingly; but the man doesn't have to get 500,000 pounds, he doesn't necessarily have to obligate himself to 500,000 pounds.

X Q. So that a man receiving a price of 15 cents and the 15 cents was based upon a 36,000-pound order; if he had purchased that in units of quantities in which you imported it, namely, 5,000 or 8,000 pounds, if he purchased it in that quantity he would have had to pay a higher price?—A. No; not if he contracted for it. A contract customer is given a preferential discount—much the same as a man giving a blanket order for his requirements is given a preferential price. There are a lot of concerns who just order as they want something, who don't bother about a contract or blanket order, and the tendency is to charge them the maximum price.

X Q. What is the usual course?—A. The usual course is to contract or get blanket orders.

X Q. If you contracted for, say 5,000 pounds, and it was shipped in one lot, you would have to pay a higher price than if you contracted for 35,000 pounds and shipped it in 5,000-pound lots?—A. As a general thing, but not as a steady performance. A man might contract for 5,000 pounds and get just as good a price as a man buying a larger quantity, or he might get an entirely lower price. These prices are all over the lot.

Judge Brown. Over the what?

The Witness. All over the lot.

Mr. McKenna. All over the lot?

The Witness. I mean they vary within ranges, and we never have been able to see any basis for it or any reason for it.

*　　*　　*　　*　　*　　*

X Q. What I am trying to elicit is information which will explain what factors control the price. Why is it that you might purchase 5,000 pounds and import it in a 5,000-pound lot and get as good a price as by purchasing 35,000 pounds? What is the advantage of purchasing a large quantity if you don't get any benefit?—A. Well, you do get a benefit. Everything is based from a base ton price on this price list and it varies, as the quantity increases above that and changes, of course, with the different sizes and desirability from the manufacturer's standpoint of those sizes.

The witness stated that the Ford Motor Car Co. was allowed a 10 per centum discount on its 36,000-pound purchase, instead of the 2 per centum ordinarily allowed, because it was difficult to do business with that company unless it was a favored customer. He further stated that ·the merchandise here involved was sold in the United States to approximately fifty purchasers. We quote further from his testimony:

Q. *Was any shipment the usual wholesale quantity?*—A. *No.*

Q. What was the purpose of these different shipments?—A. *To have it tested in comparison with the material that was then in use.*

Judge BROWN. Didn't you offer it for sale to these companies?

The WITNESS. We offered it for sale, and these shipments were invoiced to a majority of them.

By Mr. WILSON:

Q. As sales?—A. As sales. [Italics ours.]

The witness referred to the sales in Canada as small trial lots only, and stated that his company received the same prices for the goods sold in Canada as for those sold in the United States, except that the prices ranged from 13 to 20 cents per pound in Canada, whereas, they ranged from 15 to 20 cents per pound in the United States.

It will be observed that practically all of his testimony relative to wholesale quantities was based upon a price list which he received sometime in December 1930, when they were no longer making grade 80 graphite electrodes, the kind here involved. The witness, nevertheless, insisted that the usual wholesale quantity was 36,000 pounds, *and that appellee's graphite electrodes sold to purchasers in the United States were not sold in the usual wholesale quantities.*

It would seem, from the testimony of Mr. Harty, that the purpose of selling appellee's graphite electrodes, both in the United States and in Canada, was to ascertain whether they could develop a market for them.

It would seem to be clear that if the appellate division of the Customs Court relied upon the testimony of the witness Harty, a considerable portion of which we have hereinbefore quoted, as establishing that the involved merchandise had no foreign values, it might well have relied upon it as establishing that there were no United States values for such merchandise.

Many of the sales in the United States were in less quantities than those made in Canada, as shown by the invoices to purchasers in the United States and the testimony of record as to the quantities sold in Canada.

There is no evidence of record other than the testimony of Mr. Harty as to the usual wholesale quantities of this or like merchandise in the United States.

The witness O'Neil testified as to the usual wholesale quantities of electrodes sold by the Acheson Graphite Co., both in the United States

and in Canada. He did not testify, however, as to the usual wholesale quantities of appellee's graphite electrodes, either in the United States or in Canada.

Obviously, if the merchandise here involved is not similar to that sold by the Acheson Graphite Co., as contended by counsel for appellee and as held by the court below, testimony as to the usual wholesale quantities of the Acheson Graphite Co.'s graphite electrodes is wholly irrelevant to the issues here under consideration.

It is true that fewer sales of merchandise like that here involved were made in Canada than in the United States. However, it cannot be questioned, in view of the uncontradicted testimony of appellee's own witnesses and the admissions of appellee's counsel, that several sales of substantial quantities of such merchandise were made in Canada under precisely the same conditions as prevailed in the United States. Furthermore, it is clear from the evidence of record and the admissions of counsel, hereinbefore quoted, that if the sales made in Canada were in trial lots only, those made in the United States were also in trial lots only.

It will be observed that the court stated in that part of its decision hereinbefore quoted that—

When grade 80 [merchandise exactly like that here involved] was used in Canada, if any, the same results were obtained. There was therefore no market in Canada for this merchandise.

Just what meaning the court intended to convey by that language, we are unable definitely to determine. However, if it intended to say that there was no market in Canada for merchandise like that at bar, because some of it proved to be unsatisfactory, we think it proper to observe that the same situation prevailed as to like merchandise sold in the United States. The court further stated that—

The peculiar situation under which it [the involved and like merchandise] was manufactured, that is sustained not only by the importer's witnesses but by the special agent's report, Exhibit 3, convinces us that as to this merchandise there was no merchandise of the same or similar character sold in the foreign market.

It clearly appears from the record that the merchandise sold in Canada and that sold in the United States was manufactured under the same conditions. We are unable to understand how "The peculiar situation under which it was manufactured" would permit its sale in the United States, and, at the same time, prevent its sale in Canada.

It further appears from the record that the trial court, in determining the United States values of the involved graphite electrodes, took the total number of pounds of the various sizes and the total invoice prices, and divided the total invoice prices by the number of pounds so as to determine the average prices per pound. (Some of the invoices included a certain number of pounds of graphite elec-

trodes for which there was no charge. The prices on most of the invoices vary, regardless of the amount and sizes sold.) The trial court then took the average prices per pound, deducted freight and duty charges, and thereby found, what it called, the United States values per pound. The trial court no doubt followed that system, because of the fact that there was no evidence of record to establish "the price at which such * * * imported merchandise" was "freely offered for sale, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported mechandise, in the usual wholesale quantities and in the ordinary course of trade," as provided in subsections (d) and (e) of sections 402 of the Tariff Acts of 1922 and 1930, respectively.

We think it is clear that the trial court had no authority, under the quoted provisions of the statutes, to hold that the involved merchandise had United States values, in view of the fact that there is no evidence of record to establish the price or prices at which it was freely offered for sale in the usual wholesale quantities and in the ordinary course of trade in the United States, nor did it have authority, in view of the provisions of the statutes hereinbefore quoted, to use the average prices at which the merchandise was sold in the United States as a basis for determining its United States values.

It clearly appears from the record that the involved merchandise had no export values.

In view of the fact that the witness Harty testified that the usual wholesale quantities were 36,000-pound lots, both in the United States and in Canada, and that the imported merchandise was not shipped to any of the purchasers in the United States in the usual wholesale quantities, and as there is no other evidence of record as to the usual wholesale quantities nor as to the price or prices at which the involved or like merchandise was sold in usual wholesale quantities either in the United States or in Canada, and as-such and like merchandise was sold both in the United States and in Canada in trial lots only for the obvious purpose of developing a market for such goods, we must hold that the record fails to establish either foreign or United States values for the involved merchandise.

Accordingly, the appellate division of the United States Customs Court was right in holding that there were no foreign values for the involved merchandise. However, it erred in holding that the evidence of record established that the involved and like merchandise had United States values, and it further erred in holding that the average prices at which the merchandise was sold in the United States were a proper basis for the determination of its United States values.

There is no evidence of record as to the cost of production.

For the reasons hereinbefore stated, the judgment is reversed and the cause remanded with directions that the judgment of the trial court be *reversed* and the cause be *remanded* to that court with directions to *dismiss* the appeal.